RONALD G. LEWIS AND KATHIE A. LEWIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lewis v. Commissioner
Docket No. 20187-84.
United States Tax Court
T.C. Memo 1986-436; 1986 Tax Ct. Memo LEXIS 166; 52 T.C.M. (CCH) 468; T.C.M. (RIA) 86436; September 15, 1986. B. Mahlon Brown, for the petitioners. Kenneth A. Burns, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined deficiencies in and additions to petitioners' income taxes as follows: Additions to Tax
Year
Deficiency [1]
Section 6653(a) [2]
1980
$8,533.08
$426.65
1981
6,761.00
338.05, plus 50% of
interest on an under-
payment of $5,000
*167 After concessions, the only issue remaining for decision is whether petitioner failed to comply with respondent's toke compliance program and, if so, whether the failure relieves respondent of his obligations to petitioner. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by reference. Petitioners, Ronald G. and Kathie A. Lewis, husband and wife, resided in Las Vegas, Nevada, at the time they filed their petition. They filed joint income tax returns for 1980 and 1981 with the Internal Revenue Service Center at Ogden, Utah. During 1980 and 1981, Kathie A. Lewis ("petitioner") was employed as a twenty-one dealer at Caesar's Palace ("Caesar's"). It is undisputed that her toke income was underreported on the returns for both years. During 1980 and 1981, respondent instituted in Nevada a toke compliance program in an attempt to stop a tax loss estimated to be in excess of $100,000,000 per year from the failure of casino dealers to fully and accurately report their toke income. The program was designed to conserve respondent's Nevada audit resources while achieving an increase *168 in the compliance by the dealers with the tip reporting requirements of the Internal Revenue Code. In general terms, under the discretionary program, the Service agreed not to audit a dealer's pre-1982 returns if the dealer fully participated in the program. On October 15, 1981, the local examination group manager for respondent sent a letter to all of Caesar's dealers informing them of the toke compliance program. The pertinent provisions of the letter are set out below: In September of this year, Internal Revenue Service initiated a payroll tax audit of your employer's tax return. Your employer was required by law to provide the information requested in connection with this payroll tax audit. As in any normal audit, the procedures included a review of the payroll records of all employees including dealers. It is the intention of the Service to use information gathered not only for a determination of the correct payroll tax of your employer, but also for the conduct of a dealers' toke project. In the alternative, the Internal Revenue Service is willing to enter into an agreement with Caesar's Palace Dealers whereby current compliance with the tax laws can be achieved without *169 conducting a toke project. You will not be audited if you agree to begin currently reporting 100 percent of your tokes under an acceptable plan. Examples of acceptable plans are as follows: * * * PLAN FOR DEALERS WHO DO NOT POOL TOKES, SUCH AS POKER AND CRAPS DEALERS OR DEALERS WHO POOL VOTE NOT TO ADOPT A REPORTING SYSTEM FOR THE GROUP: You would be allowed to report your tips individually. The individual method requires the reporting of toke income on a monthly basis to the IRS. The law requires that if you make more than $20 per month in tokes that you report them to your employer by the 10th of the following month. If you would be uneasy about reporting your tokes to your employer because of peer pressure, you may report to us and make quarterly estimated tax payments. If you do not pool tokes or the dealers in your casino do not accept a group reporting system by the compliance date, contact the IRS at 385-6362 if you want to comply. Upon notice to the IRS of your participation in either method of current compliance, you will receive a letter from the District Director stating that in return for current compliance, the Internal Revenue Service will not start an audit *170 of your tax return for toke income for 1978, 1979, 1980 or 1981 from January 1, 1981 through the date when 100 percent reporting starts. The tax savings are significant. The estimated average deficiency and penalties for any given year are over $5000.000 [sic] per year. If current compliance is not achieved, the Internal Revenue Service will be forced to pursue an information gathering project to determine toke income for past and current years. * * * We will be holding meetings for the dealers from your hotels to discuss this proposal. You may attend whichever meeting is more convenient for you. If you have any questions, you may ask them at the meeting or call us at 385-6362. Our primary goal is current compliance. Subsequently, petitioner received a second letter from respondent's acting group manager which stated in pertinent part as follows: You were among the dealers at several hotels contacted by the Internal Revenue Service in 1981 regarding the dealer toke compliance plan. The deadline to enter into the plan on an individual basis was December 10, 1981. Many dealers have informed the Internal Revenue Service that there was confusion among the dealers because *171 they had received conflicting information and therefore, they did not realize that December 10th was the last day they could enter into the compliance plan on an individual basis. Although group compliance systems could be instituted after December 10th, many dealers have informed us that they could not get a majority of dealers organized to start a group system. Since many dealers who may have wanted to enter the compliance plan may have been unable to do so, the Internal Revenue Service has decided to allow dealers who want to enter into the compliance plan to do so until April 14, 1982. You may accept the compliance plan through a majority group, a minority group, or on an individual basis. To receive the compliance letter from the District Director, you must inform the Internal Revenue Service of your intention to comply as detailed below. * * * Individual Compliance System
If you want to enter an individual compliance plan, send a letter stating your desire to comply to the Internal Revenue Service. The letter must be postmarked by midnight, April 14, 1982. Send the letter to: Internal Revenue Service, Toke Project Group, Caller Box 16045, Las Vegas, NV 89101
*172 Include your name, address, social security number, the casino you work at and the game you deal. You will be required to do the following things in connection with an individual compliance plan: 1. Maintain a monthly record of your tokes on a daily basis and submit that record to the Internal Revenue Service each month for 24 months. 2. Report all of your toke income to your employer each month as required by the Internal Revenue Code. You must report your toke income from January 1, 1982 forward. When you receive your compliance letter from the District Director, you will receive more complete details about the requirements of the individual plan, as well as the forms to fill out. The Internal Revenue Service will not audit your prior year tax returns for toke income as long as you report all your toke income from January 1, 1982 forward under an acceptable compliance plan. If you want to enter a compliance plan, you must contact the Internal Revenue Service as described above by April 14, 1982. If you decide not to enter into a compliance plan, your prior year tax returns will not be exempt from audit for toke income. In March, 1982, petitioner indicated to respondent *173 that she wished to participate in the program and received from respondent's acting district director a compliance letter which stated: In consideration of 100 percent compliance with the employee "toke" reporting requirements of the Internal Revenue Code, the Internal Revenue Service agrees to refrain from initiating any form of examination activity for toke income against you for all open years prior to January 1, 1982, the effective date of this agreement. The term "all open years" includes all individual income tax returns upon which the statute of limitations has not yet expired. This "open year" period includes the period January 1, 1981, through December 31, 1981. In consideration of the Internal Revenue Service not initiating any form of examination activity for toke income, you agree to comply fully with the toke reporting requirements of the internal Revenue Code. The reporting of your toke income through an approved system indicates your acceptance of this agreement. From April 1982 through September 1982 petitioner was on maternity leave and received no salary or toke income from Caesar's. Petitioner returned to Caesar's in October 1982 and was employed for the *174 balance of 1982 and all of 1983. The parties have stipulated that she failed to report her toke income to Caesar's for December of 1982 and for January, March, June, and November of 1983. She also admits that all of her toke income for 1982 was not reported on the original joint tax return for that year. In the administration of the toke program, respondent adopted the practice of permitting a dealer to amend his or her 1982 tax return if their toke income had not been fully reported on the original return, but only if they filed the amended return for 1982 prior to December 31, 1983. Petitioners, however, made no attempt to amend their original return until September 10, 1984, which was approximately two weeks after respondent had notified them by letter dated August 28, 1984 that their returns for 1980 and 1981 were being audited. In the audit of the 1980 and 1981 returns, respondent determined that petitioner's toke income had been underreported by $21,982 and $20,238, respectively. OPINION Petitioner claims that with the filing of the amended return for 1982 she complied with all of the terms of respondent's program and, therefore, she should be relieved from her 1980 *175 and 1981 tax liabilities. Respondent contends that petitioner failed to comply with either the letter or the intent of the agreement and that under the circumstances the amended return did not bring her into compliance with the program. Petitioner has the burden of proof. , Rule 142(a). Respondent's letters to petitioner clearly state that in order to comply with the program she would be required to: (1) affirmatively accept the program by the deadline established for Caesar's; (2) completely and accurately report to the Internal Revenue Service on a monthly basis all tokes received by her on or after January 1, 1982; and (3) report all tokes received to Caesar's on a monthly basis as required by section 6053(a). In addition to the above specific terms, respondent asserts that petitioner was also informed that under the program she was required to fully and accurately report all toke income on her tax returns. Petitioner's argument to the contrary on brief is contradicted by her testimony at trial. [3] In any event, the full and accurate reporting of taxable income is required of all taxpayers, whether or not covered *176 by the compliance program. Petitioner admits that she failed to report any toke income to Caesar's for five months and that such income was not fully reported on the initial joint return for 1982. She further admits that the amended joint return for 1982 containing all of her toke income was not filed until after she was informed of the impending audit for 1980 and 1981. It is apparent, therefore, that petitioner failed to comply with her obligations under the toke program. Petitioner contends, however, that even if she failed to comply with the terms of the program respondent should be prohibited from auditing her pre-1982 returns because: (1) the program constituted an amnesty program under which she acquired certain rights which are not subject to forfeiture; (2) the audit would violate her constitutional right to due process; or (3) the audit would violate her constitutional right to the equal protection of the law. First, petitioner insists *177 that respondent's toke program amounted to an amnesty under which she acquired certain absolute rights that are not subject to forfeiture in the absence of clear and unequivocal language setting forth the conditions of forfeiture. Respondent, on the other hand, argues that his toke program was nothing more than administrative management of available resources. From our examaination of the entire record, we can find no evidence which indicates that respondent ever presented the toke program as a tax amnesty. Furthermore, even if it were presented as a tax amnesty, we are satisfied that petitioner's obligations under the toke program were clearly and unequivocally stated as pre-conditions to respondent's obligations under the agreement. Secondly, petitioner argues that respondent's failure to give her notice of his audit criteria for noncomplying dealers was in violation of her constitutional right to due process. In reply, respondent contends that he was under no duty to notify noncomplying dealers of the time within which they would be permitted to amend their returns, nor was he required to give noncomplying dealers a hearing to determine if they should be audited. It is well *178 settled that with exceptions we will not go behind a notice of deficiency to examine the motives, administrative policies, or procedures of respondent in making a determination. ; ; . The rationale for such conclusion being that a trial before this Court is a proceeding de novo and our determination must be based upon the merits of the case as presented here and not upon a record previously developed at the administrative level. . A recognized exception to this rule is that where there is substantial evidence of unconstitutional conduct on the part of respondent's agents the integrity of our judicial process would be impugned if we permitted respondent to benefit from the unconstitutional conduct. See . In this case, however, petitioner has failed to make a showing that her constitutional rights have been violated. Due *179 process does not require respondent to use any particular method in selecting taxpayers for audit. The broad mandate to investigate and examine persons who may be liable for taxes vests in respondent the discretion to determine which taxpayers can and should be audited with the resources available to him. . Nor can we agree with petitioner's assertion that lack of written notice with respect to respondent's audit criteria denied her due process. The Constitution's due process requirements are satisfied where an "adequate opportunity is afforded for a later judicial determination of the legal rights" involved. . That requirement is satisfied by petitioner's right to a trial de novo in this Court. Finally, petitioner argues that her constitutional right to the equal protection of the law has been violated because other noncomplying dealers were permitted by respondent to avoid audits for 1980 and 1981 by simply filing amended returns for 1982. Here again, it is the well-established position of this Court that our responsibility is to *180 apply the law to the facts of the case before us and to determine the correct tax liability of the particular taxpayer or taxpayers involved. How the Commissioner may have treated other taxpayers has generally been considered irrelevant to our decision. See , and the cases cited therein; see also . Furthermore, even the conscious exercise by respondent of some selectivity in enforcement is not in and of itself a constitutional violation of equal protection if the selection is not based on impermissible considerations such as race, religion, or other arbitrary classification. . Petitioner also argues that respondent's audit discriminated against her in particular. To prevail on this ground, petitioner must meet two requirements. First, she must demonstrate that, while others similarly situated have not been selected for audit even though engaged in conduct of the type forming the basis of the tax deficiencies against her, she was singled out for tax audit and a deficiency determination. Second, she *181 must demonstrate that the Commissioner's discriminatory selection of her was based upon impermissible considerations such as race, religion, or the desire to prevent the exercise of her constitutional rights. ; ; ; ; ; . Respondent asserts, and petitioner has failed to present any evidence to the contrary, that only those dealers who amended their 1982 returns before the commencement after December 31, 1983 of audit proceedings for the years prior to 1982 were considered to be in compliance with the toke program. It was only those dealers, like petitioner, who failed to fully report by December 31, 1983, their 1982 toke income by amended return or otherwise, that were selected for audit in the prior years. Consequently, petitioner has failed to establish that she *182 was not treated by respondent in the same manner as all other dealers in her position were treated by respondent. Therefore, her asserted constitutional right to the equal protection of the law was not denied. We conclude, therefore, that petitioner failed to comply with the terms of the toke compliance agreement, and respondent had no obligation to refrain from auditing the 1980 and 1981 joint tax returns. To reflect the foregoing, as well as concessions made by the parties, Decision will be entered under Rule 155.
Footnotes
1. The parties stipulated that the deficiencies for each year shall be $5,000 in the event this Court rules that petitioners are not relieved of their 1980 and 1981 tax liabilities. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided.↩
3. QUESTION: Under this compliance program, what do you understand your obligations to be? What were you supposed to do? ANSWER: I was supposed to start declaring a hundred percent of my income to the IRS and pay taxes on it.↩